Wendy Dumlao (Bar # 250528)
1804 Garnet Avenue, #435
San Diego, CA 92109
Telephone (209) 663-9541
Facsimile (619) 467-7988

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CATHERINE CEBULSKI AND THOMAS CEBULSKI (PARENTS), INDIVIDUALLY AND ON BEHALF OF THEIR CONSERVATEE, KARL CEBULSKI (STUDENT).<br><br>　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT<br>　　　　　　　　　Defendant. | Case No.: **'21 CV0503 GPC JLB**<br><br>NOTICE OF EMERGENCY MOTION FOR ENFORCEMENT OF STAY PUT ORDER/MOTION FOR PRELIMINARY INJUNCTION TO ENFORCE ADMINISTRATIVE ORDER OF STAY PUT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. |

Plaintiffs, by and through counsel undersigned, and pursuant to Federal Rule of Civil Procedure 65, hereby file this Emergency Motion for Enforcement of Stay Put Order/Motion for Preliminary Injunction to Enforce Administrative Order of Stay Put issued by Administrative Law Judge Penelope Pahl on March 11, 2021, in connection with a pending Petition for Due Process arising under the Individuals with Disabilities

Education Act. This Motion is supported by the Memorandum of Points and Authorities attached hereto and, by this reference, incorporated herein.

Respectfully submitted this 22 day of March, 2021.



Wendy Dumlao
Attorney for Plaintiffs

## Memorandum of Points and Authorities

Plaintiffs (hereinafter "Parents") are the parents of a conserved adult (hereinafter "Student") who is still eligible to receive special education under the Individuals with Disabilities Education Act (IDEA) and California law. They are seeking an Order compelling the San Diego Unified School District (hereinafter "the District") to comply with an existing Order of Stay Put issued by the Special Education Division of the Office of Administrative Hearings (hereinafter "OAH"). The District has knowingly and intentionally failed to voluntarily provide any comparable services to implement Student's last agreed upon and implemented Individual Educational Plan (IEP) (hereinafter the "Stay Put IEP") and has continued in its intentional refusal to provide appropriate and comparable services to Student after it was ordered to implement Student's Stay Put IEP by OAH. In short, the District has ignored its obligation under Student's IEP, federal and state law, and is in violation of an OAH Order. Plaintiffs have exhausted all attempts to obtain the District's compliance and are left with no option but

to seek judicial intervention in federal court to enforce this administrative Order and compel the District to comply with its legal obligations to Student.

## I. __Factual Background__

Student is a young man who receives special education services under the category of autism.  See Affidavit of Catherine Cebulski ("Mother"), paragraph 1, attached hereto as **Exhibit A**. Since August 8, 2019, Student has attended an out of state Residential Treatment Center (RTC) called Genesee Lake in Waukesha, Wisconsin. See **Ex. A**, ¶ 2. He was placed there through an Individual Education Plan (IEP) agreed to by his school district, San Diego Unified School District. See **Ex. A**, ¶ 2.  Student has a history of needing placement outside the family home and has attended non- public schools the entirety of his educational career, due to his significant behavior which has included violence/aggression (including charging at staff), ripping/shredding his clothing until he is naked, and significant property damage. See **Ex. A**, ¶ 3. Student's last agreed upon and implemented Individual Education Plan (IEP) ("The Stay Put IEP") is dated March 9, 2020.  A copy of the IEP and its signature page is attached as **Exhibit B.** Student's IEP mandated supports, special education and related services included:

- Specialized Academic Instruction: 345 minutes per day

- Additional Adult Support (1:1 aide) 345 minutes per day

- Parent Education-Counseling: 60 minutes per month

- Individual Counseling: 30 minutes per week

- Language and Speech Services: 240 minutes per month

- Occupational Therapy: 30 minutes per month

- MHRS-Residential – 1440 minutes per day

See **Ex. B**. The setting for all of Student's services was "Non-public residential school – outside California". *Id*. The residential services listed on Student's IEP were provided in a home owned by Genesee Lake called Corey House where Student resides while he attends Genesee Lake. See **Ex. A**, ¶ 5. Student's Stay Put IEP also provides an individualized transportation plan for Student's safety and the safety of other students as Student has a history of breaking school bus windows with his bare hands and other aggressive and dangerous behaviors, some so severe they resulted in his prior school calling police to remove him. See **Ex. A**, ¶ 6.  See **Ex. B**. The transportation plan requires that Student be transported in a private bus (no other children), with 1:1 bus aide support, a wedge to place between him and the window. *Id.* A prior IEP when Karl was still attending school in San Diego also identified a specialized safety harness that Karl was supposed to have to protect him and the aide. See **Ex. A**, ¶ 6.

In December 2020, Genesee Lake advised Parents that it would discharge Student on his 22nd birthday – March 10, 2021. See **Ex. A,** ¶ 7.  In response, on December 12,

2020, Mother emailed the District and requested an IEP meeting to discuss the upcoming transition. See **Ex. A**, ¶ 8.  Since that initial email to the District, Mother has attended four IEP meetings: January 29, 2021, February 8, 2021, February 22, 2021 and March 8, 2021. See **Ex. A**, ¶ 9. During one of the IEP meetings, the IEP team specifically discussed how Karl's IEP was being implemented at Genesee Lake:

   a. Specialized Academic Instruction (SAI) was provided by a credentialed special education teacher, in person, at Genesee Lake's non-public school. The teacher had the assistance of a class instructional assistant. Student also had the support of an additional adult (1:1 aide) during all school hours. The school day was 345 minutes long.

   b. In addition to the direct support available during the school day, Genesee Lake had access to additional behavioral support and crisis staff in the event there was a behavioral emergency with Karl (or any of the other students).

   c. Speech and Language Therapy, in person, during the school day, at Genesee Lake's non-public school by a licensed speech and language therapist.

   d. Occupational Therapy was provided by "consult" with the occupational therapist consulting both with the Genesee Lake school staff and the residential staff at the Corey House.

e.   Counseling Services were available to Parent virtually or by telephone as parents did not reside in Wisconsin; counseling services were available to Student on a scheduled basis but he sometimes did not choose to attend.

f.   Residential services to implement independent living and behavior goals in Student's IEP were provided in the Corey House where Student lived. There were 3 Adult staff throughout the day for 6 adult students (including Student); during the "night shift" there was one "awake" staff member in the Corey House at all times.

See **Ex. A,** ¶ 10.

The District attempted to locate another RTC that would accept Student; no RTC was willing to accept Student. See **Ex. A,** ¶ 11. The District was repeatedly requested at each of the four IEP meetings convened between January 29, 2021 and March 8, 2021 to identify its plan to implement Student's Stay Put Services if a replacement RTC could not be located and the District repeatedly refused to answer that question. See **Ex. A**, ¶ 12. The District was requested to provide Prior Written Notice (PWN) of its plan to implement Student's Stay Put services upon his discharge from Genesee Lake; as of the writing of this Motion, the District has refused to provide such Notice. See **Ex. A**, ¶ 13. The District did ultimately issue a PWN, on March 20, 2021, but it was still nonresponsive to how the District intended on implementing student's Stay Put services given that an RTC has not been found.

Student was discharged from Genesee Lake on March 10, 2021. See **Ex. A, ¶** 11.

Student's father was able to get leave from his active-duty military deployment to fly to

Wisconsin to bring Student to San Diego. See **Ex. A,** ¶14. Since Student arrived in San

Diego, the District has not provided one minute of residential services in Students current

home setting, which is a private home obtained by Parents for him where he could be safe

(hereinafter "Student's home") and where Parents could remain safe in the family

residence. See **Ex. A, ¶** 15. No Prior Written Notice identifying an in-person school

based program with credentialed special education staff, a trained behavior 1:1 aide, and

all other supports and services, including an individualized transportation plan has been

provided by the District. See **Ex. A, ¶** 16.

## II. <u>Procedural Background</u>

A petition for Due Process was filed on March 1, 2021 and served electronically

upon the Director of Special Education in the District the same date. See Petition for Due

Process attached as **Exhibit C** and email service to Sarah Ott, Executive Director of

Special Education attached as **Exhibit D.**  A Motion for Stay Put was filed and served

that same day. See Motion for Stay Put attached as **Exhibit E** and Ms. Ott's confirmation

of receipt attached as **Exhibit F.** The Motion was granted by the Office of Administrative

Hearings on March 11, 2021. See Order of Administrative Law Judge Penelope S. Pahl

granting the Motion for Stay Put attached hereto as **Exhibit G**. The Order stated:

1. Student's motion for stay put is GRANTED. However, due to the unavailability of Genesee as a placement, Student's stay put is as follows:

a) residential placement in a certified non-public, non-sectarian school which provides special education and related services that, as closely as possible, replicate the services of Student's last attended, out of state RTC, unless the parties otherwise agree.

b) IEP services, including:

• Specialized Academic Instruction or SAI in a non-public residential school outside California for 345 minutes per day with an instructional aide assisting student for 345 minutes during the school day.

• Transportation to and from school, including a bus monitor for daily transportation to the school site;

• Counseling, 30 minutes per week;

• Speech and Language services 240 minutes per month;

• Occupational therapy 30 minutes per month classroom consultation; 5

• Parental education and/or counseling 60 minutes per month;

• Residential mental health services, 1440 minutes per day

• All accommodations provided for in Student's March 9, 2020 IEP unless otherwise agreed by the parties.

2. In light of the urgent circumstances of this case, San Diego is ordered to expeditiously secure a comparable placement so that every effort is made to avoid an interruption in Student's education;

See **Ex. G**.

Despite the "urgent circumstances", the District has failed to provide comparable services to Student while continuing to try to secure a comparable placement.

### III.    Legal and Statutory Authorities

A. The IDEA's Purpose

In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Further, the Act's purpose is "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B). The statute was intended to address the inadequate educational services offered to children with disabilities and to combat the exclusion of such children from the public school system. 20 U.S.C. § 1400(c)(2)(A) and (B). To accomplish these objectives, the federal

government provides funding to participating state and local educational agencies, which is contingent on each agency's compliance with the IDEA's procedural and substantive requirements. 20 U.S.C. §1416.

### B. General Stay Put Requirements

If there is a disagreement between parents and a school district regarding "any matter relating to" the child's educational placement, either party may seek an administrative due process proceeding. 20 U.S.C. §§ 1415(b)(6), (f), (g)(2). California adopted legislation to comply with IDEA's due process hearing requirements. Cal. Educ. Code §§ 56500-56507. Under state law, a parent may initiate a due process hearing regarding the provision of a free appropriate public education for a child and that hearing will be conducted "at the state level." *Id.* at § 56501(a), (b)(4). The decision of the hearing officer "shall be the final administrative determination and binding on all parties" unless a party "exercis[es] the right to appeal the decision to a court of competent jurisdiction ... within 90 days of receipt of the hearing decision." *Id.* § 56505(g),

The IDEA requires that during the pendency of a due process hearing, the student "shall remain in the then-current educational placement," unless otherwise agreed between the school district and parent. 20 U.S.C. § 1415(j); see also Ed. Code§ 56505(d). This is commonly referred to as the "Stay Put" requirement. See e.g., *Termine v. William S. Hart Union High Sch. Dist.*, 219 F.Supp.2d 1049, 1050 n.1(C.D. Cal. 2002). The

purpose of Stay Put is to provide continuity and maintain the "status quo" in a student's educational program and services. *Stacey G. v. Pasadena Independent Sch. Dist.,* 695 F.2d 949, 953,(5th Cir. 1983); *Zvi D. v. Gordon Ambach*, 694 F.2d 904 (2d Cir. 1982). The right to stay put is unequivocal. *Honig v. Doe*, 484 U.S. 305 (1988). For purposes of "Stay Put", courts have found that the "current educational placement" is typically the placement called for in the student's IEP, which has been implemented prior to the dispute arising. *Johnson v. Special Educ. Hearing Office*,287 F.3d 1176, 1180 (9th Cir. 2002); *Thomas v. Cincinnati Bd. of Educ.*,918 F.2d 618, 625 (6th Cir. 1990. Regulations adopted by the State Board of Education in California define "specific educational placement" as "that unique combination of facilities, personnel, location or equipment necessary to provide instructional services to an individual with exceptional needs, as specified in the IEP .... " (Cal. Code Regs, tit. 5, § 304 2(a), emphasis added.) If the IEP mandates services by a non-public agency, "Stay Put" requires a District to maintain non-public agency services. *Joshua A. v. Rocklin Unified Sch. Dist.,* 559 F. 3d 1036 (9th Cir. 2009).

### C.  Stay Put and Changed Circumstances

The Ninth Circuit has recognized that due to changing circumstances, the status quo cannot always be replicated for purposes of "Stay Put". *Ms. S ex rel. G. v. Vashon Island Sch. Dist.,* 337 F.3d 1115, 1133-35 (9th Cir. 2003). A student is not entitled to the

identical placement pursuant to his or her IEP when that placement is no longer possible. Id. at 1133-34. If circumstances have changed, "Stay Put" "entitles the student to receive a placement that, as closely as possible, replicates the placement that existed at the time the dispute arose, taking into account the changed circumstances." *Van Scoy v. San Luis Coastal Unified Sch. Dist.,* 353 F.Supp.2d 1083, 1086 (C.D. Cal. 2005). When a student's current educational placement becomes unavailable, the LEA must provide the student with a similar placement in the interim. *Alston v. District of Columbia*, 439 F.Supp.2d 86 (D. D.C. 2006) (When residential program in which student was placed via an IEP was no longer available, the school district was required to find a suitable alternative when the parent invoked the Act's stay-put provision); *McKenzie v. Smith*, 771 F. 2d 1527, 1533 (D.C. Cir. 1985) (Student was placed by District in a private special education school which determined that student would be discharged; District found to have violated parent's rights by not offering a comparable private special education placement/services upon that discharge after parent rejected District's proposed change of placement to a District public school campus.) If implementation of Student's last agreed upon IEP placement is impossible, the District must provide services that approximate, as closely as possible, the old IEP. *Ms. S. v. Vashon, supra.*

D. <u>Enforcement of Administrative Orders Under IDEA</u>

California's statutory and regulatory framework implementing the IDEA, as interpreted by the Ninth Circuit Court of Appeals, makes clear that the Office of

Administrative Hearings, and its former iteration, the Special Education Hearing Office, do not have jurisdiction to enforce its own orders. See *Wyner v. Manhattan Beach Unified School District*, 223 F. 3d 1026 (9th Cir. 2000). As such, when a party needs judicial enforcement of an ALJ's administrative Order in an IDEA due process matter, jurisdiction properly lies in federal court under IDEA's "right to sue provision", 20 U.S.C. §1415 (i)(2), as Parents are "aggrieved" by the failure of the District to comply with the hearing officer's Order. See *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 115-16 (1st Cir. 2003) (Congress could not have intended to leave plaintiffs without an IDEA statutory remedy when they succeed before a hearing officer and the District fails to fulfill its continuing obligation to provide services).

### E.  Standards for Enforcement of an Existing Order of Stay Put

The record demonstrates that Parents have already obtained an Order of Stay Put from the Office of Administrative Hearings. See **Ex G**.  Stay put "functions as an 'automatic' preliminary injunction, meaning that the moving party need not show the traditionally required factors (e.g., irreparable harm) necessary to obtain preliminary relief." *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1037 (9th Cir. 2009) (citing *Drinker ex rel Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996). The automatic stay-put exists because of "Congress's sense that there is a heightened risk of irreparable harm inherent in the premature removal of a disabled child to a potentially inappropriate educational setting." *Id.* at 1040. IDEA's stay put provision "substitutes an

absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." *Zvi D. v. Ambach*, *supra*, 694 F.2d at 906. *See also Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal.*, *supra*, 287 F.3d 1176, citing with approval *Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook County v. Ill. State Bd. of Educ.*, 103 F.3d 545, 550 (7th Cir. 1996) (holding that the application of the preliminary injunction equitable factors to the execution of stay-put would "dilute the statutory framework" of the stay-put provision).

The automatic nature of IDEA's Stay Put provision "acts as a powerful protective measure to prevent disruption of the child's education throughout the dispute process." *Joshua A. v. Rocklin, supra*., 559 F. 3d at 1040. "[T]he stay put provision requires no specific showing on the part of the moving party, and no balancing of equities by the court..." *Id*.  If Parents were seeking an Order of Stay Put as a matter of first impression in this Court, the preliminary injunction standards would not apply. If Parents established that there was a Due Process Petition pending, the District would be required to implement Student's last agreed upon and implemented IEP without further proof.

Applying the preliminary injunction standard when an existing Order of Stay Put is being intentionally violated would unreasonably burden a Student who is the party suffering from the action and benefit the District who is refusing to comply.  As the issue at bar is implementation of Stay Put, the *Joshua A. v. Rocklin* standards should be applied

to analyze whether the Motion to Enforce Stay Put should be granted.

      F.  <u>Preliminary Injunction Standards</u>[1]

    A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.,* 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.* at 20. *Cf Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) (applying *Winter* factors).

    The Ninth Circuit has a "sliding scale" test under which a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits are raised and the balance of hardships tips sharply in the plaintiff's favor, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1134-5 (2011), interpreting and applying the *Winter* factors.

**IV.**  <u>**Argument**</u>

    A. <u>Likelihood of Success on the Merits</u>

---

[1] Parents include the legal requirements for the higher preliminary injunction standards without conceding they are applicable here.

Parents have established that there is an Order of Stay Put which requires implementation of Student's Stay Put IEP and that the District has provided no prior written notice of any implementation plan as of the date that this Motion is drafted, March 19, 2021. Stay Put serves as an automatic injunction and proof of the preliminary injunction standards is not required in order to maintain the Stay Put placement and services throughout the pendency of a judicial proceeding.  Here, the issue is not obtaining an Order of Stay Put – that has already been obtained when the District made clear by its words and actions that it had no intention of providing the services mandated by the IEP even when another RTC could not located. Here, it is forcing the District to comply with the Stay Put Order, which it has an obligation to do as a matter of law.

It is suspected that the District may attempt to cobble something together AFTER this Motion is filed to make it look like it is in compliance and create a fact issue about whether or not the services it then will claim are available are "comparable". If that occurs, Parents still can demonstrate a likelihood of success on the merits as Student is entitled to each and every of the services on his Stay Put IEP every day, and unless there is PROOF that each and every one of the services was implemented and is being implemented from March 11, 2021 going forward, consistent with the IEP, including specifically 1440 minutes of in person/in home mental health-residential services (MHMR-Residential services on the IEP), the District is not in compliance. In the absence of an available RTC, the district's obligation is to implement the services "as

closely as possible" and each of the Stay Put supports and services could have been and should have been implemented in San Diego in the manner described by the IEP team at a duly convened IEP meeting (See **Ex. A**, ¶ 10). The District was obligated to identify, by Prior Written Notice, the changes in the provision of Student's free and appropriate public education when he was discharged from Genesee Lake and specifically how it intended on implementing the provision of services to Student while it was searching for another RTC. *See* 20 U.S.C. Sec. 1415(b)(1)(3); 34 C.F.R. §300.503 (a). *See also Union Sch. Dist. v. Smith*, 15 F. 3d 1519 (9th Cir. 1994) (The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any; a formal, specific offer from a school district assists parents in "present[ing] complaints with respect to any matter relating to the ... educational placement of the child".) *See also M.C. v. Antelope Valley Union High Sch. Dist.,* 858 F. 3d 1189 (2017) (it is a procedural violation of IDEA to deprive parents of the knowledge of what services are offered to the student – in kind and in duration; such procedural violations make it impossible for parents to assess the substantive reasonableness of those services).  Here, while the District had an obligation under the IDEA to provide written notice independently, Parents have also repeatedly asked the District to provide Prior Written Notice identifying the specific details of how it will provide comparable services to implement

Student's Stay Put IEP in light of the unavailability of another RTC. The District has refused to provide this written notice clearly identifying each and every one of the services on Student's IEP and how it will implement them. The District did ultimately issue a PWN but it is nonresponsive.

## B. Irreparable Harm

Student is currently in San Diego with no RTC placement and no comparable services. This is more than simply the Student not receiving an "appropriate" education – he is receiving NO district provided education or services at all.  The failure to provide a free and appropriate education (FAPE) is itself irreparable harm. *See e.g. Sabatini v. Corning-Painted Post Area Sch. Dist.,* 78 F. Supp. 2d 138, 143 (W.D.N.Y. 1999) (The denial of a FAPE over an extended period does constitute harm, and the longer that denial continues, the more irreparable it becomes – this is particularly true for a student close to 22 years old in need of an RTC because the older he gets the less likely it becomes that an RTC will consider accepting him);  *J.B. v. v. Killingly Bd. of Educ.,* 990 F. Supp. 70, 72 (D. Conn. 1997) ("J.B. continues to be denied his right to a free appropriate public education and until he receives that to which he is entitled under the IDEA, he is suffering irreparable harm"). *Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.,* 175 F. Supp. 2d 375, 393 (N.D.N.Y. 2001) (It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm). Nor is there an adequate remedy at law –

compensation in money can never replace the provision of a meaningful education at the time it is required to be provided. *See e.g. John T. v. Delaware County Intermediate Unit,* 2000 WL 558582 at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time."); *A.T., I.T. v. New York State Educ. Dept.,* 1998 WL 765371, at *11 (E.D.N.Y. Aug. 4, 1998)(" Z.T.'s injury is actual and imminent because she is currently being deprived of the free appropriate public education to which she is entitled under the IDEA. . . . In the absence of an injunction, Z.T. faces further damage to her development. This type of injury cannot be remedied by an award of monetary damages, which of course would not provide Z.T. with the free and appropriate education that she has been denied.")

C. Balance of Equities

There is no "equity" that falls to the District here. While there is no available RTC, Parents have never claimed that the district can only implement Stay Put by finding an RTC that does not currently exist. The law is clear that when implementation of the exact provision of FAPE is impossible due to changed circumstances, the District must implement the services as closely as possible. *See supra* at pages 11-12. Yet here, the District has not even tried. The Stay Put IEP has 1440 minutes of residential services. This service is available on the open market through private agencies that supply behaviorally trained in home providers for exactly this type of situation. See **Ex. A** at ¶

22.  The District is aware of this but doesn't want to spend the money to pay for a behaviorally trained provider to support Student for the 1440 minutes of the day mandated on his IEP. A student's receipt of an appropriate education trumps a school district's financial interest. *Dominique L. v. Bd. of Educ. of Chicago,* No.10-C-7819 (N.D. Ill. 2011); The District has no legitimate claim to any equities here – it is legally obligated to provide services and it is not. It was paying for an RTC and now is paying NOTHING for Student who is getting NOTHING.

   D. <u>Public Interest</u>

   The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A). "[T]he maintenance of appropriate education services to disabled children is in the public interest, as Congress has detailed in the IDEA." *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark,* 344 F.3d 335, 352 (3d Cir. 2003); *see* 20 U.S.C. § 1400(c)(1) (explaining Congressional finding that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities."). Ensuring a school district's compliance

with the mandates of the IDEA is an important public policy interest. *Cosgrove v. Bd. of Educ. of the Niskayuna Cent. Sch. Dist*. 175 F.Supp.2nd 375 (N.D.N.Y. 2001).

## V. <u>Conclusion</u>

Student's Stay Put IEP mandates an RTC placement. The Office of Administrative Hearings has ordered the district to implement that IEP and each one of the services, supports and accommodations contained in that IEP.  The RTC contemplated by Student's Stay Put IEP is not available. A replacement RTC is not available. The District must provide a special education placement that is comparable to the Student's "current educational placement" to implement the Stay Put IEP and comply with the OAH Order.

In *Alston*, *supra*, the Court explained what must be provided by the District during the period of "Stay Put", noting that "current educational placement" means much more than the goals but does not necessarily mean only the same "physical school" last attended by the Student. 439 F.Supp.2d at 90-91, citing, *Spilsbury v. District of Columbia,* 307 F. Supp. 2d 22, at 26-27 (D.C. Cir 2004)(explaining that "the IDEA clearly intends  `current educational placement' to encompass the whole range of services that a child needs" and that the term "cannot be read to only indicate which physical school building a child attends").   As in *Alston*, *supra*, Student's last agreed upon IEP included a non-public school for Student (for 345 minutes per day of "specialized academic instruction" with additional 1:1 instructional assistant support during the school

day), related services of speech (240 minutes per month), occupational therapy (30 minutes per month) and counseling (30 minutes per week for Student and 60 minutes per month for parents). All services were provided by employees of the non-public school. The IEP also mandated 24/7 MHRS-residential services (for 1440 minutes every day) which was also provided by the non-public school.  As there is no comparable RTC placement that will accept Student, the District must provide comparable services on Student's IEP, replicating them as closely as possible. The District cannot cherry pick which of the IEP mandated services it chooses to implement under its "comparable services – Stay Put" obligation. It must implement them all.

The District had an independent legal obligation to implement the Stay Put IEP and did not. The Office of Administrative Hearings has ordered the District to implement the Stay Put IEP. It has not. Parents have established an indisputable case on the merits as the District, to date, refuses even to provide a *Union v. Smith* Prior Written Notice of its implementation plan in light of the compelled change of placement that identifies how it will implement each of the supports and services on Student's IEP until an RTC is found or Student ages out. Apparently, Parent is supposed to guess what the District's plan is, and assume there is something, somewhere by someone, who has some qualifications to do something which would put the District in legal compliance.  As the very purpose of the IDEA is to provide special education and related services to students with disabilities, the equities and public interest undeniably weigh in favor of the Student. Student is at his

home, without any district provided or funded services, with his backpack by the front door waiting to go to a fully staffed school program 345 minutes per day, the harm is significant and irreparable. Whether Parents must establish the preliminary injunction standards or the Stay Put injunction standards from *Joshua A v. Rocklin, supra*, the record has been made.

This Court should immediately enter an Order compelling the District to comply with the ALJ's order by doing each of the following:

1. Provide a District credentialed special education teacher (or a privately hired credentialed special education teacher) and an additional adult who is behaviorally trained through a Non-Public Agency that supplies Registered Behavioral Technicians (RBTs) to create and implement curriculum to work on Student's goals on his IEP for 345 minutes of in - person instruction for 80 days (that is the number of days between March 11, 2021 and June 30, 2021 (when Student would have aged out).

2. Provide a location (school) where the staff in paragraph 1 above can safely provide a program for Student.

3. Provide a district bus (or private van) with a driver, an aide, a wedge to place between the student and the window and Student's safety vest to transport Student to/from his home to the school location identified in paragraph 2,

above.

4.  In person speech services (240 minutes per month) by a District speech and language pathologist (or a private speech and language pathologist under contract with the District) to provide speech services during the school day set out in item 1, above at the location set out in item 2, above.

5.  In person counseling services to Student 30 minutes per week by a District counselor (or private counselor under contract with the District) to provide counseling services during the school day set out in item 1, above.

6.  Counseling Services to Parent – 60 minutes per month – to be provided by a District counselor (or private counselor under contract with the District) at a mutually agreed upon schedule and in a manner suitable to parents (e.g. virtual/telephonic/in person).

7.  Occupational therapy service by consult to Student's team for 30 minutes per month by a District occupational therapist or a private occupational therapist under contract with the District.

8.  Residential services in Student's home for 1440 minutes per day via reimbursement/payment of all hours Parent has contracted for[2] through June 30,

---

[2] Parent has been unable to contract for the totality of all hours required from agencies or other providers due to staffing shortages caused by the delay in the District taking steps to contract for or otherwise provide for services for Student. Parents have actually had to provide some of the services while taking Family Medical Leave/Military Leave.  Parents

2021.

Dated:  March 21, 2021                    Respectfully submitted,


_Wendy Dumlao_

Wendy Dumlao
Attorney for Plaintiffs

seek immediate payment for all services they have contracted for through Habita, a staffing agency, or through private providers and an order that the District continue paying for all services for which parents have contracted going forward through Habita or private providers to implement the Stay Put residential services through June 30, 2021. The Court Order should be clear on the timing of such payments or the District will take weeks/months to fund these services. The Court should order District payment (or reimbursement if already required to have been paid) within 21 days of receipt of billing statements identifying the amount due or payments already made.

Cebulski v. SDUSD: Motion to Enforce Administrative Order/Motion for Preliminary Injunction  25

## <u>Statement Under Penalty of Perjury of Catherine Cebulski</u>

Submitted in Support of Plaintiffs' Motion to Enforce Administrative

Order/Motion for Preliminary Injunction

1. My name is Catherine Cebulski and I am the mother of and conservator for Karl Cebulski, age 22, who has Autism and is currently conserved. I make this statement based upon personal knowledge. My son is eligible for special education and related services currently as a student with Autism and will remain eligible until June 30, 2021 when he will "age out".

2. Since August 8, 2019, my son has attended an out of state Residential Treatment Center (RTC) called Genesee Lake, in Waukesha, Wisconsin; he was placed there through an Individual Education Plan (IEP) agreed to by his school district, San Diego Unified School District.

3. Karl has a history of needing placement outside our family home and has attended non-public schools the entirety of his educational career, due to his significant behavior which has included violence/aggression (including charging at staff), ripping/shredding his clothing until he is naked, and significant property damage.

4. The last agreed upon and implemented IEP for Karl is dated March 9, 2020 and continued his placement and services at Genesee Lake.

5. Pursuant to Karl's "Stay Put IEP", he receives all of the following supports and services at Genesee Lake:

      Specialized Academic Instruction: 345 minutes per day

      Additional Adult Support (1:1 aide support) 345 minutes per day

      Parent Education-Counseling: 60 minutes per month

      Individual Counseling: 30 minutes per week

      Language and Speech Services: 240 minutes per month

      Occupational Therapy Services: 30 minutes per month

      MHRS-Residential Services– 1440 minutes per day

The school-based services are provided at Genesee Lakes non-public school and the residential services are provided in a home owned by Genesee Lake called Corey House where Karl resides while he attends Genesee Lake.

6. Karl's Stay Put IEP also provides an individualized transportation plan for Student's safety and the safety of other students as Karl has a history of breaking school bus windows with his bare hands and other aggressive and dangerous behaviors, some so severe they resulted in his prior school calling police to remove him. The transportation plan requires that Karl be transported in a private bus (no other children), with 1:1 bus aide support, a

wedge to place between him and the window.  A prior IEP when Karl was still attending school in San Diego also identified a specialized safety harness that Karl was supposed to have to protect him and the aide.

7. In December 2020, Genesee Lake told me that Karl would be discharged on his 22nd birthday – March 10, 2021.

8. In response, I emailed the District on December 12, 2020 and requested that it set an IEP meeting to discuss the upcoming discharge and create a transition plan for Karl through June 30, 2021, which is when Karl would "age out" of eligibility for special education and related services.

9. Since my initial email to the District, I have attended four (4) IEP meetings: January 29, 2021, February 8, 2021, February 22, 2021 and March 8, 2021.

10. During one of the IEP meetings, the IEP team specifically discussed how Karl's IEP was being implemented at Genesee Lake:

   a. Specialized Academic Instruction was provided by a credentialed special education teacher, in person, at Genesee Lake's non-public school. The teacher had the assistance of a class instructional assistant. Karl also had the support of an additional adult (1:1 aide) during all school hours. The school day was 345 minutes long.

   b. In addition to the direct support available during the school day, Genesee Lake had access to additional behavioral support and crisis

staff in the event there was a behavioral emergency with Karl (or any of the other students).

c.  Speech and Language Therapy, in person, during the school day, at Genesee Lake's non-public school by a licensed speech and language therapist.

d.  Occupational Therapy was provided by "consult" with the occupational therapist consulting both with the Genesee Lake school staff and the residential staff at the Corey House.

e.  Counseling Services were available to parents virtually or by telephone as neither my husband (who was deployed with the military) nor I lived in Wisconsin; counseling services were available to Karl on a scheduled basis, but he sometimes did not choose to attend.

f.  Residential services to implement independent living and behavior goals in Karl's IEP were provided in the Corey House where Karl lived. There were 3 Adult staff throughout the day for 6 adult students (including Karl); during the "night shift" there was one "awake" staff member in the Corey House at all times.

11. The District attempted to locate another RTC that would accept Karl; no RTC was willing to accept him as a student.

12. I brought a special education consultant to the IEP meetings whose name was Amy Langerman who requested, on my behalf, that the District tell us how it intended to implement Karl's Stay Put services. Despite repeated requests for this information at each IEP meeting, the District staff refused to identify how it would implement Stay Put after Karl's discharge, even after it was known that there was no replacement RTC.

13. Ms. Langerman also requested, on my behalf, that the District provide Prior Written Notice on how it intended to implement Karl's Stay Put services upon his discharge from Genesee Lake. To date, I have not received any such Prior Written Notice.

14. Karl was discharged from Genesee Lake on March 10, 2021. My husband was able to get leave from his active-duty military deployment to fly to Wisconsin to bring Karl home.

15. Since Karl has been home in San Diego, the District has not provided one minute of residential services in Karl's current home setting, which is a private home obtained by my husband and I for Karl to live where he could be safe and where we could remain safe in our separate family residence.

16. Since Karl has been home, the District has not identified a school-based placement with appropriate credentialed staff (Special Education Teacher), behaviorally trained additional adult support (1:1 aide) and all other supports

and services, including an individualized transportation plan, at a location where Karl can be safely educated for 345 minutes per day.

17. On March 15, 2021, a school bus arrived at Karl's private residence. I received no notice from the District that a bus was arriving on that date. As I had not received Prior Written Notice of any school based plan, I did not send Karl on that bus.

18. I immediately drove to Whittier School where I learned the bus would be going. I asked to see "the program" or whatever it was that the District intended for my son, had he taken the bus. I was shown a room. There was no teacher in the room. There was no curriculum in the room. There were no students in the room.

19. As I was getting ready to leave the campus, the bus that had been at Karl's house arrived. Several young, school aged children got off the bus.

20. The next day, March 16, 2021, a school bus also arrived at Karl's house and it already had young school aged children on it. I did not put Karl on that bus both because his IEP requires a private bus with no other children for his safety and the safety of other children and because the District has not identified a program/location that is appropriately staffed to implement a 345 minute per day program implementing Karl's IEP.

21. On Tuesday, March 16, 2021, after the school bus left Karl's home, I advised the district, through our special education consultant, Amy Langerman, that if I received written notice of a Stay Put implementation plan, I was ready, willing and able to send Karl to an appropriate program in San Diego that provides comparable services to those that were provided at Genesee Lake by appropriately credentialed and trained staff with safe transportation to/from that program pursuant to the transportation plan in Karl's IEP; I still have not received any such written notice.

22. I have found a private agency called Habita that has behaviorally trained staff available for hire to provide the residential services for Karl in his home; the District refuses to contract with Habita or otherwise pay for such services. I have contracted for some residential services from Habita.

23. I have also contracted with private staff to provide additional in-home residential services to implement the residential services on Karl's IEP.

24. I am unable to currently contract for the full 1400 minutes per day of residential services due to staffing shortages but Habita is "staffing up" to try to make other staff available and I continue to search for private providers to staff hours that Habita can not currently staff.

25. My husband has provided and will continue to provide residential in-home services in Karl's private home while he is on leave from his military

deployment; when he has to return to his deployment I will be forced to take family medical leave to provide residential services to replace those I can not currently staff through contract due to staffing shortages.

26. My son has placed his backpack next to the front door, waiting to go to school. He is very anxious and upset about not being able to go to school.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this ___19___ day of March, 2021.

<br>

Catherine Cebulski